UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| BRIDGET PARKER, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) Docket no. 2:17-CV-216-GZS |
| JOSH DALL-LEIGHTON et al., | ) |
| Defendants. | ) |

**ORDER ON PLAINTIFF'S MOTION TO STRIKE
AND DEFENDANTS' MOTIONS TO DISMISS**

Before the Court are the Motion to Dismiss filed by Defendants Scott Landry, Randall Liberty, Dr. Joseph Fitzpatrick, and the State of Maine (ECF No. 13), Plaintiff's Motion to Strike (ECF No. 16), and Defendant Renee Shanks's Motion to Dismiss (ECF No. 29). For the reasons briefly explained below, the Court DENIES Plaintiff's Motion; GRANTS Defendant Landry, Liberty, Fitzpatrick, and the State of Maine's Motion; and GRANTS IN PART and DENIES IN PART Defendant Shanks's Motion.

### I. LEGAL STANDARD

The Federal Rules of Civil Procedure require only that a complaint contain "a short and plain statement of the grounds for the court's jurisdiction . . . a short and plain statement of the claim showing that the pleader is entitled to relief; and a demand for the relief sought." Fed. R. Civ. P. 8(a)(1)-(3). The Court assumes the truth of the complaint's well-pleaded facts and draws all reasonable inferences in the plaintiff's favor. Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012). Under Rule 12(b)(6), the Court "may consider only facts and documents that are part of or incorporated into the complaint." United Auto., Aerospace, Agric.

Implement Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 39 (1st Cir. 2011) (quotation marks omitted).

A viable complaint need not proffer "heightened fact pleading of specifics," but in order to survive a motion to dismiss it must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). At this point in the litigation, "the determination of whether an issue is trialworthy simply is not the same as the determination of whether a plaintiff states a claim upon which relief can be granted." Bodman v. Maine, Dep't of Health and Human Servs., 720 F. Supp. 2d 115, 121 (D. Me. 2010).

However, "[i]f the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quotation marks omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (stating that a court need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements"). In short, a plaintiff must plead facts indicating "more than a sheer possibility that a defendant has acted unlawfully." Id.

## II. FACTUAL BACKGROUND

On June 14, 2017, Plaintiff Bridget Parker filed a Complaint (ECF No. 1) against Corrections Officer Josh Dall-Leighton; Corrections Officer Renee Shanks; Scott Landry, Warden of the Maine Correctional Center; Randall Liberty, Warden of the Maine State Prison; and Dr. Joseph Fitzpatrick, Commissioner of the State of Maine Department of Corrections, as well as against the State of Maine. Parker alleges she was subjected to unwelcome sexual advances and eventually coerced into sexual contact by Defendant Dall-Leighton during times that she was a

state inmate and he was responsible for transporting her between work or school and the Southern Maine Re-entry Center.

As alleged in the Complaint, on several occasions, Dall-Leighton pulled a transport vehicle onto a side road or into a parking lot and coerced Parker into sexual relations in the vehicle, sometimes without a condom. On one occasion, Parker and Dall-Leighton had sex in a transport vehicle parked outside her work. These sexual encounters resulted in Parker contracting an incurable, sexually transmitted disease.[1] Dall-Leighton also pressured her into communicating with him via phone during her furloughs and the two engaged in sexual conversations and exchanged sexual texts and photographs. After one sexual encounter in a transport van, Dall-Leighton "said 'shit, this [is] Butterfield's van,' meaning [another corrections officer] who was charged with sexually assaulting another inmate, and who [Dall-Leighton] was best friends with." (Compl. ¶ 62.) "On information and belief, [Dall-Leighton] was suspended, partially without pay, during the period of Butterfield's investigation for inappropriate sexual relations with female inmates." (Id.)

Dall-Leighton made unwanted sexual comments and touched Parker inappropriately at the re-entry center and generally interacted with her in a way that would not be normal for a corrections officer to act toward an inmate in front of other inmates, other corrections officers, and her co-workers. Before or after several sexual encounters, Dall-Leighton made excuses to other corrections officers or to re-entry staff to explain any delay in Parker arriving at her scheduled destination. On at least one occasion, other inmates questioned Parker about why she was being

---

[1] Regarding treatment of the genital herpes she allegedly contracted from Dall-Leighton, Parker claims that she "asked to be tested for STDs so that she could confirm what she thought had been transmitted to her by Defendant Dall-Leighton, however, the prison Nurse Practitioner refused to give [Parker] a test because '[Parker] couldn't prove where she got it' and that [Parker] 'should stay away from the boys'; as a result, [Parker]'s genital herpes were left untreated." (Compl. (ECF No. 1) ¶ 141.) The Court does not understand Parker to be basing any of her claims against Defendants Landry, Liberty, Fitzpatrick, Shanks, or the State of Maine on her treatment by corrections medical staff.

3

spoken to familiarly by a corrections officer and she "ma[d]e up responses to why she was being spoken to by a" corrections officer. (Compl. ¶ 86.) One particular inmate, Jessica Pomerleau,[2] "kept asking [Parker] why [Dall-Leighton] kept talking to [Parker], to which [Parker] had to make up random responses, such as there was an issue with her laundry bag, etc." (Compl. ¶ 87.) At one point, Parker "began to try to push for a new job so that she would not have to be transported by" Dall-Leighton (Compl. ¶ 97), but she did not get a new job and she "did not disclose why" she wanted one (Compl. ¶ 98).

However, Parker did tell Defendant Corrections Officer Renee Shanks about the situation after Shanks approached Parker several times to ask "if something was going on between her and" Dall-Leighton. (Compl. ¶ 66.) Parker disclosed to Shanks how Dall-Leighton's conduct was affecting her emotionally and Shanks helped Parker in her attempt to get a new job so that she could avoid contact with him. Shanks also gave Parker her phone number and they talked by phone and text, as well as in person. Despite having approximately ten conversations with Parker about the situation with Dall-Leighton, Shanks "never reported it to the authorities" (Compl. ¶ 72) and "made no attempts at disclosing the alleged abuses to anyone" (Compl. ¶ 98). During her conversations with Shanks, Parker told Shanks "that she thought [Dall-Leighton] was just like [another corrections officer] who, on information and belief, had been investigated and fired for 'preying' on female inmates." (Compl. ¶ 73.) Shanks responded that Dall-Leighton "was just looking for 'happiness'" and that Dall-Leighton "was nothing like" the other officer. (Compl. ¶ 74.)

Parker eventually "got very intoxicated on alcohol so that she would be sent back to the prison as she needed to escape the situation she was being forced to live at the Re-entry Center."

---

[2] This person's surname is spelled variously in the Complaint as "Pomerleu" and "Pomerealu," although the Court surmises that the correct spelling is "Pomerleau."

4

(Compl. ¶ 120.) She was sent back to prison, where she disclosed the situation with Dall-Leighton to another inmate, who reported it to the authorities. Parker cooperated with the ensuing investigation, "although she did hold back certain information as she had a lack of trust for the system that she was in." (Compl. ¶ 123.) When Parker returned to the re-entry center, Shanks "immediately approached [Parker] about not telling anyone that [Parker] has previously disclosed to [Shanks] what had occurred, and also that if anyone asked, that [Shanks] did not give [Parker] her [telephone] number and that [Parker] instead saw it on a desk and wrote it down herself." (Compl. ¶ 129.) Parker believed that Shanks was asking her to lie about Shanks's knowledge of Dall-Leighton's conduct. Shanks also told Parker that she was sorry about previously having said that Dall-Leighton was not like the other officer who preyed on women, and that Shanks now agreed with Parker that Dall-Leighton was like that officer.

The investigation into Dall-Leighton stopped once he was arrested. Approximately two months after the investigation into Dall-Leighton's sexual assaults of Parker commenced, she "learned that that there was also an investigation into alleged sexual misconduct by Defendant Dall-Leighton towards Jessica Pomerle[a]u." (Compl. ¶ 133.) Another inmate, Crystal Gagnier, also known as "Tasha," also confided in Parker that Dall-Leighton "had done the same thi[n]gs to her that he had done to" Parker. (Compl. ¶ 134.) Parker told Shanks about what Tasha had told her. Parker understood that Shanks spoke to Tasha but that Tasha denied being assaulted by Dall-Leighton. Shanks never reported the allegations involving Tasha, or her conversation with Tasha, to any authorities. As a result of Dall-Leighton's conduct, and in addition to the harm caused by her sexually transmitted disease, Parker is now uncomfortable "being alone with any men of power"; has panic attacks when she sees a male police officer; is depressed and feels inhibited from moving forward with her goals and aspirations; cannot enter into a relationship with a man;

5

and is "extremely sensitive to being touched now, which has caused her a great deal of issues with her children as it has created a barrier between her and them." (Compl. ¶¶ 149-55.)

During the relevant period, Defendants Landry and Liberty "had oversight and control of the Southern Maine Re[-]entry Center and its employees." (Compl. ¶¶ 5-6.) Defendant Dr. Fitzpatrick "had oversight and control of all State of Maine correctional facilities and corrections employees, including, but not limited to, the Southern Maine Re[-]entry Center." (Compl. ¶ 8.) Defendant Shanks was acting as a corrections officer for the Maine Department of Corrections at the Southern Maine Re-entry Center. (Compl. ¶ 7.)

Based on these allegations, Parker brought the following claims against Defendants Dall-Leighton, Landry, Liberty, Fitzpatrick, all in their individual and official capacities, and the State of Maine: Count I (Assault and Battery); Count II (Negligence); Count III (Fraudulent Misrepresentation); Count IV (Negligent Misrepresentation); Count V (Negligent Infliction of Emotional Distress); Count VI (Intentional Infliction of Emotional Distress); Count VII (Civil Conspiracy); Count VIII (Conspiracy to Interfere with Civil Rights, 42 U.S.C. § 1983); Count IX (Conspiracy to Interfere with Civil Rights, 42 U.S.C. §§ 1985(3), 1988); Count X (Punitive Damages); Count XI (Due Process − Fourteenth Amendment to the U.S. Constitution; Article I, § 6-A to the Maine Constitution); Count XII (U.S. Constitution Fourth, Fifth, and Eighth Amendments; Maine Constitution, Article I, §§ 5, 6-A, and 9); and Count XIII (False Arrest, False Imprisonment, and Invasion of Privacy). Pursuant to a stipulation, Parker is only bringing the following claims against Shanks, in her individual and official capacity: Count II (Negligence); Count V (Negligent Infliction of Emotional Distress); Count VII (Civil Conspiracy); County VIII (Conspiracy to Interfere with Civil Rights, 42 U.S.C. § 1983); Count IX (Conspiracy to Interfere with Civil Rights, 42 U.S.C. §§ 1985(3), 1988); Count XI (Due Process − Fourteenth Amendment

to the U.S. Constitution; Article I, § 6-A to the Maine Constitution); and Count XII (U.S. Constitution Fourth, Fifth, and Eighth Amendments; Maine Constitution, Article I, §§ 5, 6-A, and 9). (See Stipulation (ECF No. 31), PageID #s 148-49.) Parker is seeking damages against all Defendants, including punitive damages, as well as attorney's fees.[3]

On July 6, 2017, Defendants Landry, Liberty, Fitzpatrick, and the State of Maine filed an Answer and pleaded failure to state a claim.[4] (ECF No. 12.) On July 10, 2017, these same Defendants filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 13.) On July 27, 2017, Plaintiff filed a response in opposition and moved to strike Defendants' Motion to Dismiss because they had already filed an Answer. (ECF Nos. 15 & 16.) On September 15, 2017, Defendant Shanks filed a Motion to Dismiss the claims against her pursuant to Rule 12(b)(6).[5] (ECF No. 29.)

### III. ANALYSIS

#### A. Plaintiff's Motion to Strike

Federal Rule of Civil Procedure 12(b)(6) provides that a motion asserting failure to state a claim "must be made *before* pleading if a responsive pleading is allowed." (Emphasis added). Defendants admit that they failed to comply with this Rule when they filed their Motion to Dismiss after filing an Answer. (Defs.' Opp'n to Mot. to Strike (ECF No. 20), PageID # 108.) However, courts frequently treat an untimely motion to dismiss as a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). See, e.g., Aponte-Torres v. Univ. of Puerto

---

[3] The Court need not, and does not, opine at this time on the availability in this action of the various remedies Plaintiff seeks, such as damages for loss of parental consortium on behalf of her children. (See Compl. ¶ 210.)

[4] The Court notes that this suit was briefly stayed before the Defendants filed any responsive pleading due to a state government shutdown.

[5] Defendant Dall-Leighton has not appeared in the suit and a default has been entered against him. (ECF No. 28.)

Rico, 445 F.3d 50, 54 (1st Cir. 2006) ("Because the defendants previously had answered the amended complaint, the district court appropriately treated their motion to dismiss as one for judgment on the pleadings."). A motion to dismiss and a motion for judgment on the pleadings "are ordinarily accorded much the same treatment," but for the "modest difference" that a "Rule 12(c) motion . . . implicates the pleadings as a whole." Id. at 54-55. In this case, the Court notes that any consideration of Defendants' Answer does not change its analysis of whether Plaintiff has stated a claim. Given this, and the fact that Defendants did not waive their failure to state a claim defense by filing their Motion to Dismiss after their Answer, see Fed R. Civ. P. 12(h), the Court can discern no prejudice to Plaintiff from treating Defendants' Motion as a motion for judgment on the pleadings. Plaintiff's arguments against this straightforward course are unconvincing and not supported by any legal citation. The Court also rejects Plaintiff's attempts to introduce into the record through briefing on the motion to strike newspaper articles that she did not include with her Complaint, and the Court does not consider these documents. See Collier v. City of Chicopee, 158 F.3d 601, 602-03 (1st Cir. 1998) (explaining that consideration of material outside the pleadings necessitates conversion of a Rule 12 motion into a Rule 56 motion for summary judgment with that Rule's different legal standard and notice requirements).

For these reasons, the Court DENIES Plaintiff's Motion to Strike and considers the Motion filed by Defendants Landry, Liberty, Fitzpatrick, and the State of Maine as a motion for judgment on the pleadings. However, the Court notes this conversion to Rule 12(c) allows the Court to review the arguments presented under the same legal standard as a motion to dismiss.

B. Motion to Dismiss by Defendants Landry, Liberty, Fitzpatrick, and the State of Maine

Plaintiff's various federal law claims against Defendants Landry, Liberty, and Fitzpatrick fall under the rubric of 42 U.S.C. § 1983. See Morse v. Cloutier, 869 F.3d 16, 20 n.1 (1st Cir. 2017) ("As a general matter, section 1983 supplies a cause of action against any person who, while acting under color of state law, violates another person's constitutional rights.") The bar for adequately pleading a Section 1983 claim against high-ranking government officials based on the unconstitutional conduct of their subordinates is relatively high.[6] The United States Supreme Court had made clear that *respondeat superior*, or a supervisor's vicarious liability for violations committed by his or her subordinate, does not apply in 1983 actions. Iqbal, 556 U.S. at 676. Rather, "a plaintiff must plead that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution." Id. (emphasis added).

An official may be liable in his or her supervisory capacity under Section 1983, but such liability is premised on a claim that "the [supervisor]'s action or inaction" in the face of a subordinate's violations "was affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation, or acquiescence or *gross negligence amounting to deliberate indifference*." Guadalupe-Báez v. Pesquera, 819 F.3d 509, 515 (1st Cir. 2016) (alterations in original) (emphasis added) (quotation marks omitted). To establish "deliberate indifference," a plaintiff "must show (1) that the officials had knowledge of facts, from which (2) the official[s] can draw the inference (3) that a substantial risk of serious harm exists." Id. (alteration in original) (quotation marks omitted). As further explained by the First Circuit:

> [D]eliberate indifference alone does not equate with supervisory liability. Causation remains an essential element, and the causal link between a supervisor's

---
[6] Plaintiff has styled Count VIII as "Conspiracy to Interfere with Civil Rights 42 U.S.C. § 1983." (Compl., PageID # 26.) However, Plaintiff has not pleaded any facts to support a conspiracy, and the Court reads the Complaint to assert a deliberate indifference theory of liability under Section 1983, as explained below.

conduct and the constitutional violation must be solid. This causation requirement contemplates proof that the supervisor's conduct led inexorably to the constitutional violation. That is a difficult standard to meet but far from an impossible one: a plaintiff may, for example, prove causation by showing inaction in the face of a known history of widespread abuse sufficient to alert a supervisor of ongoing violations. [I]solated instances of unconstitutional activity will not suffice. In addition, a supervisor must be on notice of the violation. Such notice may be either actual or constructive.

Id. (alterations in original) (quotation marks and internal citations omitted).

Recent cases are instructive for evaluating a claim of deliberate indifference at the motion to dismiss stage. In Guadalupe-Báez, a man who alleged he was shot by a police officer brought a suit against, among others, the Superintendent of the Puerto Rico Police Department. 819 F.3d at 513. The First Circuit determined that the plaintiff had stated a Section 1983 claim against the Superintendent on a deliberate indifference theory of liability in large part due to the existence of a United States Department of Justice report documenting a pattern and practice of excessive force in the police department. Id. at 517. The Court explained as follows:

> Guadalupe alleges . . . that [the Superintendent] continued—or at least failed to ameliorate—'policies which cause the pattern and practice of use of excessive force.' When this allegation is evaluated in conjunction with the rampant constitutional violations limned in the Report and the parade of horribles allegedly visited upon Guadalupe, a plausible inference exists that [the Superintendent] either condoned or at least acquiesced in the offending conduct . . . . The existence of the Report put [the Superintendent] on luminously clear notice that he might become liable, in his supervisory capacity, should his acts and omissions contribute to the continuation of the pathologies described in the Report.

Id. at 516-17. Essentially, the existence of the report detailing a pattern of excessive force, and the Superintendent's failure to address this pattern, was "enough to get Guadalupe across the plausibility threshold." Id. at 516. However, the First Circuit emphasized that even with the report, Guadalupe's claim against the Superintendent barely survived the motion to dismiss: "there is enough here—*though not by much*—to permit Guadalupe to proceed to discovery." Id. at 517 (emphasis added).

More recently, a judge in this District distinguished Guadalupe-Báez in a case in which a patient who was allegedly physically abused at a state mental facility by corrections officers brought a claim against the Commissioner of the Maine Department of Health and Human Services. In Edson v. Riverview Psychiatric Center, the court dismissed the deliberate indifference theory claim against the Commissioner despite documented concerns about the presence of corrections officers at the facility. 1:16-CV-79-JAW, 2017 WL 780787, at *15 (D. Me. Feb. 28, 2017). The court concluded that although the Commissioner was aware of these concerns,

> [n]othing cited by Ms. Edson would have alerted [the Commissioner] that the [corrections officers who abused her] would violate the policies for restraint, seclusion or abuse by pepper spraying and restraining Ms. Edson without cause. There are no allegations of prior instances of violations by these [corrections officers] or of a widespread history of abuse by the law enforcement officers at Riverview generally. Therefore, [the Commissioner] cannot be held liable under a deliberate indifference theory [for the alleged incident of physical abuse].

Id.

Turning to the specifics of Plaintiff's claims, the only factual allegation implicating Landry, Liberty, or Fitzpatrick in the abuses by Dall-Leighton is that Dall-Leighton was at some point suspended during an investigation into inmate sexual abuse by another corrections officer, an officer with whom Dall-Leighton was "best friends." (See Compl. ¶ 62.) Plaintiff alleges that the Defendants are "proximately liable" for Dall-Leighton's conduct because they had actual or constructive knowledge that Dall-Leighton was previously suspended and that this information "should have given rise to suspicions regarding" Dall-Leighton. (See, e.g., Compl. ¶ 162.) Plaintiff's allegations regarding the scope of Defendants' knowledge are not entirely clear. For example, Plaintiff has not pleaded any facts as to the specific time period or reason for Dall-Leighton's suspension: it is unclear whether Dall-Leighton was suspended before, during, or after his alleged abuse of Plaintiff, and Plaintiff has not clearly pleaded whether the suspension was

related to the investigation of the other officer. Plaintiff also has not clearly pleaded whether she is alleging actual or constructive knowledge on the part of any of the individual Defendants. (Compare Compl. ¶ 158 (alleging "actual knowledge") with Compl. ¶ 162 (alleging Defendants "knew or should have known").) Finally, it is unclear whether Plaintiff is alleging that Defendants had knowledge of the exact nature of the relationship between Dall-Leighton and the other officer. Reading the factual allegations in the light most favorable to Plaintiff, however, the Court understands Plaintiff to be alleging that the Defendants exhibited deliberate indifference because they actually knew that Dall-Leighton had been suspended during the investigation into sexual misconduct by the other officer and also actually knew that the two men were best friends. The Court concludes that these allegations are not sufficient to state a claim.

In light of Guadalupe-Báez, in which the First Circuit held that the threshold for pleading supervisory liability under Section 1983 had only barely been crossed due to an official's inaction in the face of documented, longstanding, and widespread abuses by multiple subordinates, 819 F.3d at 517, the Court determines that Plaintiff cannot state a plausible claim that Defendants are liable for Dall-Leighton's assaults based only on their knowledge of an investigation of another corrections officer who was best friends with Dall-Leighton, as well as their knowledge that Dall-Leighton was suspended during that investigation. Further, the facts that Plaintiff has pleaded point *away* from deliberate indifference in so much as they establish that corrections officials had acted to investigate and address threats of inmate sexual abuse by corrections officers.[7] The Court

---

[7] The Court notes that Plaintiff has pleaded that a third corrections officer had been previously "investigated and fired for 'preying' on female inmates." (Compl. ¶ 73.) Plaintiff does not allege that this prior situation should have made Defendants more vigilant in regard to Dall-Leighton and, in fact, the prior investigation and firing cuts against the allegation that Defendants were deliberately indifferent to sexual abuses by corrections officers. Plaintiff also alleges learning about the existence of "an investigation into alleged sexual misconduct by Defendant Dall-Leighton towards Jessica Pomerle[a]u" approximately two months after Plaintiff alerted corrections authorities about her own abuse. (See Compl. ¶ 133.) However, Plaintiff does not appear to allege that the existence of this investigation supports her claims against Defendants, and the Complaint leaves open the possibility that the Pomerleau investigation commenced after Plaintiff's alleged abuse or after she reported the abuse to the authorities.

12

therefore concludes that Plaintiff has failed to state a plausible claim under Section 1983 as to Defendants Landry, Liberty, and Fitzpatrick.

Plaintiff also pleads a claim for Conspiracy to Interfere with Civil Rights pursuant to 42 U.S.C. § 1985(3). Section 1985(3) essentially prohibits "two or more persons . . . conspir[ing to] . . . depriv[e] . . . any person or class of persons of the equal protection of the laws." It is well established that

> a claim under § 1985(3) must contain four elements. First, the plaintiff must allege a conspiracy; second, [she] must allege a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws; third, [she] must identify an overt act in furtherance of the conspiracy; and finally, [she] must show either injury to person or property, or a deprivation of a constitutionally protected right.

Pérez-Sánchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008). Further, "a claim under § 1985(3) requires some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Id. (quotations marks omitted). Without even considering whether Plaintiff has adequately pleaded a class-based motivation despite not mentioning her membership in any particular class, Plaintiff has failed to allege *any facts* supporting the existence of a conspiracy or agreement between the Defendants, or a discriminatory purpose on their part. Therefore, Plaintiff has failed to state a claim under Section 1985(3).

Turning to Plaintiff's state law claims, her claims against Defendants Landry, Liberty, and Fitzpatrick based on various theories of tort liability fail for essentially the same reasons as her claims under federal law. As the First Circuit has explained, the disposition of a Section 1983 claim "also informs the disposition of [a] claim under the" Maine Tort Claims Act ("MTCA"), 14 M.R.S.A. §§ 8101-8118, based on the same underlying conduct. Berube v. Conley, 506 F.3d 79, 86 (1st Cir. 2007). The MTCA provides that state employees are generally immune from suit unless their conduct "was so egregious as to clearly exceed any discretion the officers could have

possessed under the circumstances." Dimmitt v. Ockenfels, 220 F.R.D. 116, 125 (D. Me. 2004). Because Plaintiff has failed to plausibly plead that Landry, Liberty, or Fitzpatrick were deliberately indifferent to Dall-Leighton's conduct, their "conduct cannot be said to be so egregious as to deprive [them] of the immunity defense." Berube, 506 F.3d at 86. To the extent that Plaintiff has plausibly connected Landry, Liberty, or Fitzpatrick to the alleged abuse in any way, she has not plausibly alleged that these Defendants acted so egregiously that they fall outside the zone of immunity provided by state law.

For the foregoing reasons, the Court cannot from the facts alleged "'draw the reasonable inference that [Defendants Landry, Liberty, and Fitzpatrick are] liable for the misconduct alleged.'" Soto-Torres v. Fraticelli, 654 F.3d 153, 159 (1st Cir. 2011) (quoting Iqbal, 556 U.S. at 678). Further, for the reasons cogently outlined in Defendants' Motion, the State of Maine is not a proper defendant in this suit as a matter of law, nor has Plaintiff stated plausible claims against the State. (See Defs.' Mot. to Dismiss (ECF No. 13), PageID #s 80-81.) Plaintiff appears to concede as much by not substantively addressing the claims against the State in her response.[8] The Court therefore GRANTS Defendants' Motion as to Defendants Landry, Liberty, Fitzpatrick, and the State of Maine.[9]

---

[8] The Court rejects Plaintiff's invitation to disregard any argument made on behalf of the State of Maine in the Motion to Dismiss because counsel who filed the Motion initially only entered an appearance on behalf of Landry, Liberty, and Fitzpatrick. (See ECF No. 4.) Counsel is an Assistant Attorney General in the Maine Office of the Attorney General and has subsequently entered an appearance on the State's behalf. (ECF No. 18.) The Court sees no reason to disregard portions of the Motion to Dismiss based on this slight procedural irregularity that did not prejudice Plaintiff in any way.

[9] The Court notes that if it did not dismiss all claims as to Landry, Liberty, and Fitzpatrick for the reasons explained above, it would still dismiss all claims brought against these Defendants in their *official capacities*. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).

C.  Motion to Dismiss by Defendant Shanks

Plaintiff's federal law claims against Defendant Shanks also fall under the rubric of 42 U.S.C. § 1983. In particular, Plaintiff alleges that Shanks, while acting under color of state law, violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.[10] In general, a corrections officer "may be liable under the Eighth Amendment for acting with deliberate indifference to inmate health or safety." Calderón-Ortiz v. Laboy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002). An officer acts with deliberate indifference if "(1) [she] knew of (2) a substantial risk (3) of serious harm and (4) disregarded that risk." Id.

The relevant case law is limited in regard to what constitutes a corrections officer's deliberate indifference toward a risk of harm to an inmate posed by another corrections officer. However, the Court concludes that the Complaint plausibly alleges that Shanks was deliberately indifferent to the alleged abuse of Plaintiff by Dall-Leighton. There is no question the Complaint plausibly alleges that Shanks knew of a substantial risk of serious harm to Plaintiff. See Burrell v. Hampshire Cty., 307 F.3d 1, 8 (1st Cir. 2002) (explaining that the alleged harm must be "objectively, sufficiently serious"); see also Calderón-Ortiz, 300 F.3d at 63-64 (treating the sexual assault of an inmate as a serious harm). Further, the Court concludes the Complaint plausibly alleges that Shanks disregarded the risk by failing to report the sexual assaults or failing to take any affirmative step to stop the assaults other than attempting to help Plaintiff change jobs. Shanks correctly notes that Plaintiff has not pleaded that Shanks was in a supervisory position over Dall-Leighton, but the Court does not understand Plaintiff to be premising her claims against

---

[10] Neither side appears to dispute that the Complaint alleges that Plaintiff was in the incarcerative custody of the Maine Department of Corrections during the assaults and therefore the Court assumes, for the purposes of deciding this motion, that the Eighth Amendment applies. The Court is also not aware of, and the parties have not pointed to, any precedent suggesting that the analysis under Article I, Section 9, of the Maine Constitution concerning whether an inmate's treatment constitutes cruel and unusual punishment differs in any material way from the Eighth Amendment analysis.

15

Shanks on supervisory liability. Finally, on this record and at this stage of the litigation, the Court cannot conclude that Shanks is entitled to qualified immunity.[11]

The Court, however, concludes that Plaintiff's other federal law claims must be dismissed. Specifically, the Complaint fails to plausibly allege any agreement between Shanks and others that would support the conspiracy claims.[12] The Complaint also fails to plausibly allege that Shanks in any way violated Plaintiff's due process rights: contrary to Plaintiff's suggestion, the fact that inmates have due process rights regarding the imposed conditions of their confinement or disciplinary measures does not mean that unauthorized activities such as sexual assaults implicate due process.

Turning to Plaintiff's state law claims, the conspiracy and due process claims fail for the reasons discussed above in the context of the federal law conspiracy and due process claims.[13] However, the Court concludes that Plaintiff has adequately pleaded state law negligence and negligent infliction of emotional distress claims against Shanks. Under Maine law, "[t]o establish a prima facie case of negligence, a plaintiff must establish that a duty was owed, the duty was breached, and the plaintiff's injuries or damages were proximately caused by the breach of that

---

[11] On the undeveloped record and the arguments presented by the parties, the Court finds no basis for concluding that Shanks's obligation to pass along a credible report of an inmate sexual assault was not clearly established under the law. In support of her argument to the contrary, Shanks cites Woods v. York County, 534 F. Supp. 2d 153 (D. Me. 2008). However, Woods is factually and procedurally distinguishable. In Woods, this Court concluded that two prison officials facing claims of supervisory liability were not "deliberately indifferent to [an inmate's] rights to be free from sexual assault" when they allowed an accused corrections officer to continue to have contact with inmates during the initial stages of an internal investigation into sexual assault allegations. Id. at 161. As a result, the Court concluded that these two officials were entitled to qualified immunity and granted summary judgment on that basis. See id. at 160-61. In contrast, Shanks's alleged failure to report delayed the commencement of any investigation. Additionally, Plaintiff asserts in her response to this argument that Shanks was a "mandated reporter." (Pl.'s Response (ECF No. 32), PageID # 162.)

[12] The Court is not swayed by Plaintiff's wild speculation in her briefing on this issue. (See Pl.'s Response, PageID #s 158-60.)

[13] The Court also rejects any claim that Shanks is liable for an "unreasonable search and seizure" under either the Fourth Amendment or Article I, Section 5, of the Maine Constitution—if Plaintiff in fact intended to make any such claim—as being entirely unsupported by the facts pleaded in the Complaint.

duty." Radley v. Fish, 856 A.2d 1196, 1200 (Me. 2004) (quotation marks omitted). Shanks "assumes for the purpose [of her Motion] that Parker can prove Shanks owed a duty to report the sexual assault[s] . . . and that Shanks breached this duty," but contests that Plaintiff has plausibly pleaded that her injuries were proximately caused by that breach. (Def.'s Memo in Support of Mot. to Dismiss (ECF No. 30), PageID #s 137-38.) The Court disagrees with Shanks and concludes that Plaintiff has pleaded sufficient facts to support proximate causation. Simply put, Shanks's alleged failure to report the assaults or to take any meaningful action to stop them foreseeably led to those incidents of sexual assault that occurred after Plaintiff's disclosure to Shanks. See, e.g., Compl. ¶¶ 99-103, 107-08 (describing incidents occurring several weeks after the disclosure to Shanks); Johnson v. Carleton, 765 A.2d 571, 575 (Me. 2001) ("Proximate cause requires a showing that the evidence and inferences that may reasonably be drawn from the evidence indicate that the negligence played a substantial part in bringing about or actually causing injury or damage and that the injury or damage was either a direct result or a reasonably foreseeable consequence of the negligence.") (quotation marks omitted). The Court also cannot conclude that Shanks is entitled to immunity pursuant to the MTCA at this stage because the facts alleged plausibly support the conclusion that her conduct was so egregious as to deprive her of the immunity defense. See Dimmitt, 220 F.R.D. at 125.[14]

Finally, the Court concludes that Plaintiff has pleaded a plausible claim for negligent infliction of emotional distress. Under Maine law, to establish a prima facie case of negligent infliction of emotional distress, a plaintiff must plead that the defendant owed the plaintiff a duty; that the defendant breached its duty; that the plaintiff suffered severe emotional distress; and that

---

[14] The Court's conclusion regarding discretionary immunity does not foreclose a potential later determination that Shanks's actions were not part of her discretionary job duties within the meaning of the Maine Tort Claims Act. Cf. Morgan v. Kooistra, 941 A.2d 447, 453-54 (Me. 2008) (discussing conduct falling outside the scope of a state employee's discretionary duties).

the defendant's conduct caused the harm. Oceanic Inn, Inc. v. Sloan's Cove, LLC, 133 A.3d 1021, 1028 (Me. 2016). Beyond these broad elements, the Law Court has explained that it has "recognized a duty to act reasonably to avoid emotional harm to others in very limited circumstances: first, in claims commonly referred to as bystander liability actions; and second, in circumstances in which a special relationship exists between the actor and the person emotionally harmed." Curtis v. Porter, 784 A.2d 18, 25 (Me. 2001) (footnotes omitted); see also Fisk v. Mid Coast Presbyterian Church, 2:16-CV-490-JDL, 2017 WL 1755950, at *8 (D. Me. May 4, 2017) ("The claim of negligent infliction of emotional distress requires the existence of a 'special relationship' that creates a duty between the actor and the person who is emotionally harmed.")

The Court concludes that Plaintiff has pleaded facts to plausibly support the basic elements of a claim for negligent infliction of emotional distress, essentially for the reasons discussed in relation to the negligence claim. Defendant contends that, given this is not a "bystander" case, Plaintiff has failed to plead facts supporting the existence of a "special relationship" with Shanks, especially considering that "Maine has never found a [special] relationship between prison inmates and corrections officers." (Def.'s Memo in Support of Mot. to Dismiss, PageID # 139.) The Court disagrees. At this stage of the litigation and without the benefit of a fully developed factual record, the Court simply cannot say as a matter of law that the relationship between Plaintiff and Shanks as pleaded in the Complaint did not constitute a "special relationship" supporting liability for negligent infliction of emotional distress. Further, the Court notes that the facts pleaded suggest that a "special relationship" may exist to the extent that a correction officer-inmate relationship is akin to those "special relationships" that have been recognized by the Law Court. See, e.g., Steadman v. Pagels, 125 A.3d 713, 720 (Me. 2015), as amended (Mar. 1, 2016) (noting that "[t]he

relationship between a custodial parent and child is a 'special relationship' that gives rise to a heightened responsibility of care").

For these reasons, the Court declines to dismiss the cruel and unusual punishment, negligence, and negligent infliction of emotional distress claims,[15] but dismisses all other claims against Shanks.

IV. CONCLUSION

The Court DENIES Plaintiff's Motion to Strike (ECF No. 16); GRANTS the Motion to Dismiss by Defendants Landry, Liberty, Fitzpatrick, and the State of Maine (ECF No. 13); and GRANTS IN PART and DENIES IN PART the Motion to Dismiss by Defendant Shanks (ECF No. 29). All dismissed claims as to Defendants Landry, Liberty, Fitzpatrick, Shanks, and the State of Maine are DISMISSED WITH PREJUDICE.[16] The case shall proceed as to Defendant Shanks on Count II (Negligence), Count V (Negligent Infliction of Emotional Distress), and Count XII (Eighth Amendment and Maine Constitution, Article I, § 9), and shall proceed as to all claims against defaulted Defendant Dall-Leighton.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 8th day of December, 2017.

---

[15] All claims not dismissed will proceed against Defendant Shanks in her individual capacity only. See Will, 491 U.S. at 71.

[16] Dismissal of the state law claims with prejudice is appropriate because the Court has determined that Plaintiff has failed to plead plausible state law claims for the same reasons she has failed to plausibly plead her parallel federal law claims. See United States ex. rel. Kelly v. Novartis Pharm. Corp., 827 F.3d 5, 16 (1st Cir. 2016) (explaining that a federal court may dismiss state law claims with prejudice when it has retained jurisdiction over the claims and dismissed them on their merits).